**Marvin B. ROFFMAN**

v.

**Donald J. TRUMP and Trump Organization, Inc.**

**Civ. A. No. 90–4511.**

United States District Court, E.D. Pennsylvania.

Dec. 12, 1990.

Martin J. Sobol, Fox, Rothschild, O'Brien and Frankel, James C. Schwartzman, Schwartzman and Hepps, Scott L. Vernick, Philadelphia, Pa., for plaintiff.

Peter S. Pantaleo, Roxane N. Sokolove, Atkin, Gump, Strauss, Hauer & Feld, Washington, D.C., John J. Barry, Clapp & Eisenberg, Newark, N.J., for defendants.

## MEMORANDUM AND ORDER

BECHTLE, Chief Judge.

Presently before the Court is defendants' motion to dismiss Count I of plaintiff's complaint. For the following reasons, defendants' motion will be denied.

### FACTS

Plaintiff Marvin Roffman is an investment analyst who specializes in appraisal of the Atlantic City, New Jersey casino industry. On March 20, 1990, the *Wall Street Journal* published an article focusing on the likelihood of success of the Taj Mahal, a casino owned by defendant Donald Trump. The Taj Mahal was scheduled to open shortly after the article's publication. The article included the following quotation:

"When [the Taj Mahal] opens, [Trump] will have had so much free publicity he will break every record in the books in April, June, and July," says Marvin Roffman, a casino analyst with Janney Montgomery Scott. "But once the cold winds blow from October to February, it won't make it. The market just isn't there."

\* \* \* \* \* \*

"Atlantic City is an ugly and dreary kind of place," says Janney Montgomery Scott's Mr. Roffman. "Even its hardcore customers aren't coming down as much."

*The Wall Street Journal*, March 20, 1990.

On the same day the article was published, Trump, after reading the article, sent a letter to Janney Montgomery Scott ("Janney"), the investment firm that employed Roffman. Trump's letter stated that Roffman's assertions in the article were an "outrage." Trump's letter demanded that Roffman issue a public retraction of his assessment of the Taj's chances for success, or, in the absence of such a retraction, that Janney fire Roffman. The letter stated that Trump would institute a "major lawsuit" against Janney if these demands were not met. Trump also stated in his letter that he had "often thought of Mr. Roffman as an unguided missle [sic]."

On March 21, 1990 Roffman issued a retraction of the *Wall Street Journal* quotation in the form of a letter sent to Trump via facsimile. The retraction stated that the quotation from the *Wall Street Journal* article was taken out of context. On March 22, 1990, however, Roffman sent a second facsimile letter to Trump stating that Roffman had "reconsidered" the position he had taken in his earlier letter. In the second facsimile, Roffman stated that "the conditions under which I signed the [previous] letter were extremely stressful.... I retract the letter and direct that you not use it for an [sic] purpose." On March 23, 1990, Roffman was fired by Janney.[1]

The events related to Roffman's firing received substantial media attention. The following statements, made by Trump and reported in various publications, form the basis of Count I of Roffman's complaint:

Marv Roffman is a man of little talent who disagrees with other people.

—*New York Post*, March 27, 1990.

[Roffman] is mediocre, a man with no talent.... Marvin Roffman was dismissed or was about to be dismissed six months ago, and I saved his job.

—*The Philadelphia Inquirer*, March 27, 1990

[Roffman] is a very unprofessional guy. He is a hair trigger.

—*Barron's*, April 2, 1990.

1. Roffman asserts that representatives of Janney drafted the original retraction and improperly coerced him into signing it. Roffman has brought a separate action against Janney stemming from the termination of his employment.

[Janney] got rid of a bad analyst, a man with little talent. He's not a good man. —*Fortune*, May 7, 1990.

I think [Roffman] is in total conflict. —*Fortune*, May 7, 1990 (said in reference to the fact that Roffman allegedly owns stock in an entity that controls a casino that competes with the Taj Mahal).

[Roffman is a] disgrace to his profession.... I don't think Mr. Roffman is a very good analyst. —*Institutional Investor*, July 1990.

[Trump]: Here's a guy [Roffman] that used to call me, begging me to buy stock through him, with the implication that if I'd buy stock he'd give me positive comments.

[Reporter]: Are you accusing him of fraud?

[Trump]: I'm accusing him of not being very good at what he does. —*Vanity Fair*, September 1990.

Included among the statements Roffman alleges to be defamatory is Trump's reference to Roffman in Trump's March 20, 1990 letter as "an unguided missle [sic]."

Count I of Roffman's complaint brings an action for defamation based on the above statements. Trump has brought a motion to dismiss Count I.[2] For the following reasons, Trump's motion will be denied.

DISCUSSION

■ Trump maintains that the statements now at issue cannot form the basis of a cause of action by virtue of the United States Supreme Court's recent ruling in *Milkovich v. Lorain Journal Co.*, ── U.S. ──, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990). Trump reads *Milkovich* to hold that statements that are not "capable of being proved or disproved by objective evidence" can not form the basis of a defamation action. Defendant's Brief at 18. Trump maintains that his assertions are not actionable under *Milkovich* because they are not "objectively verifiable." Defendant's Brief at 20 (*citing Milkovich*). In response, Roffman argues that most of Trump's

statements go to Roffman's ability as an investment analyst. Roffman asserts that resolution of the issue of whether he is a good or bad analyst is simply a matter of reviewing his past record and determining whether his investment predictions subsequently proved accurate. Roffman maintains that Trump's statements are actionable under *Milkovich* because their truth or falsity can, in fact, be verified by objective criteria.

Both parties have assumed that the standards set forth in *Milkovich* control the disposition of the case at hand. For the reasons set forth below, however, the court finds that resort to state law standards for determining when a statement is actionable, as opposed to an analysis of the constitutional doctrine discussed in *Milkovich*, is appropriate in this case.

The law has long recognized the need for a means by which a person could vindicate an injury to his or her reputation. Until relatively recently, states remained free to fashion remedies for the redress of injuries to reputation in whatever manner they saw fit. *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), however, marked the beginning of a series of Supreme Court decisions that created limitations on state defamation law based on the First Amendment of the United States Constitution. The earliest limitations were based on the status of the plaintiff bringing the action. In *New York Times*, the Supreme Court held that a plaintiff who is a public official must prove actual malice before he or she can be permitted to recover in a defamation action. The Court extended the actual malice requirement to suits brought by "public figures" in *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967).

The Court has also focused on the content of speech in restricting state defamation law. In *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d

---

**2.** Count II of the complaint, the only other count, is an action based on "tortious interference with business relations" stemming from Trump's role in Janney's firing of Roffman. Trump has not moved for the dismissal of Count II.

789 (1974), the Court held, *inter alia*, that even private figure plaintiffs must meet the malice standard in order to recover punitive or presumed damages if the speech at issue relates to a matter of public concern. Similarly, in *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986), the Court held that private plaintiffs must bear the burden of showing the speech to be false in order to recover against a media defendant on speech of public concern.

While it can be said that the Supreme Court has "federalized" defamation law as it relates to public figures or issues of public concern, the Court has created few restrictions on state defamation law with respect to suits brought by private plaintiffs based on speech relating to issues of private concern. The Supreme Court squarely addressed the issues presented by a private plaintiff/private issue case in *Dun and Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985). In *Dun and Bradstreet*, the Court refused to extend the ruling of *Gertz, supra*, to cases involving private concern speech, holding that private plaintiffs suing on matters of private concern need not show actual malice in order to recover presumed or punitive damages. Noting that speech of private concern is of "reduced constitutional value," *Dun and Bradstreet*, 472 U.S. at 761, 105 S.Ct. at 2946, the Court held that the state's interest in allowing for the recovery of presumed and punitive damages was sufficiently significant to outweigh any First Amendment concerns.

The Supreme Court has stated that "[w]hen the speech is of exclusively private concern and the plaintiff is a private figure, as in *Dun and Bradstreet, the constitutional requirements do not necessarily force any change in at least some of the features of the common-law landscape."*

*Hepps, supra*, 475 U.S. at 775, 106 S.Ct. at 1563 (emphasis supplied). While this statement does imply that the Constitution creates some limitation on a state's right to fashion its own defamation remedy in the private plaintiff/private issue context, the Court has never ruled that the Constitution requires any change in the "features of the common law landscape" as they relate to whether statements of opinion can form the basis of a defamation action brought by a private plaintiff based on language relating to an issue of private concern. Accordingly, the actionability of statements of opinion in the private plaintiff/private issue context must be determined by reference to state law.

The court acknowledges that this position is inconsistent with those pre-*Milkovich* decisions that treated the actionability of opinions as a matter of federal constitutional law. These courts based their treatment of opinions as a matter of federal law on their recognition of an "absolute" constitutional privilege for statements of opinion.[3] This purported absolute privilege was based on *dictum* from *Gertz* which stated that "[u]nder the First Amendment, there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz*, 418 U.S. at 339, 94 S.Ct. at 3007.

The contention that the Constitution requires any separate privilege for statements of opinion, however, was expressly rejected by *Milkovich*. In *Milkovich*, a newspaper published an article implying that the plaintiff had perjured himself. In the subsequent defamation action brought by plaintiff, the defendants argued that the statements were protected by the absolute constitutional privilege for statements of opinion that had been accepted by many circuits. The Supreme Court, however, re-

---

**3.** *See, e.g., Ollman v. Evans*, 750 F.2d 970, 975, n. 8 (1984), *cert. denied* 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985) ("Although Mr. Ollman's claim arises under the District of Columbia common law of libel ..., the issue whether the allegedly libelous statements are protected opinion is to be decided as a matter of federal

constitutional law. *Lewis v. Time, supra*, 710 F.2d at 552–53."). The portion of *Lewis* referred to by *Ollman* held the actionability of opinions to be a matter of constitutional dimension because of the court's belief in the existence of a constitutional privilege for statements of opinion.

fused to recognize such a privilege. The Court expressly overruled those decisions that had found an opinion privilege, finding that their reliance on the *dictum* from *Gertz* was "misplaced." *Milkovich*, 110 S.Ct. at 2706. The Court ruled that "existing constitutional doctrine" adequately protected the relevant First Amendment interests, stating, "[w]e are not persuaded that, in addition to these protections, an additional separate constitutional privilege for 'opinion' is required to ensure the freedom of expression guaranteed by the First Amendment." *Id.* at 2707.

Prior to *Milkovich*, at least some courts treated the actionability of all statements of opinion as subject to federal standards because of the then accepted constitutional opinion privilege. The elimination of such a privilege, however, carries with it the elimination of the requirement that determining the actionability of opinions necessitates constitutional analysis. Accordingly, it is no longer accurate to say that the actionability of all opinions is a matter of federal law. The pre-*Milkovich* cases that hold to the contrary, therefore, are no longer valid authority. Instead, under *Milkovich*, it is apparent that whether the actionability of a statement of opinion is to be determined by federal or common law principles depends on whether the statement is controlled by the "existing constitutional doctrine" to which the Court referred.

As noted earlier, the Supreme Court has created few limitations on state defamation law in the context of a private plaintiff suing on an issue of private concern. It should come as no surprise, therefore, that the cases cited by *Milkovich* as establishing the "existing constitutional doctrine" that governs the type of statements that can be the subject of a defamation action all involve either public plaintiffs or public issues. In rejecting the existence of a constitutional opinion privilege, the *Milkovich* court summed up the constitutional protections which it deemed adequate to protect the relevant First Amendment interests as follows:

Foremost, we think *Hepps*, stands for the proposition that a statement *on matters of public concern* must be provable as false before there can be liability under state defamation law, at least in situations, like the present, where a media defendant is involved....

Next, the [*Greenbelt Cooperative Publishing Ass'n v.*] *Bresler* [398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970)]—*Letter Carrier* [*v. Austin*, 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974)]—*Falwell* line of cases provide protection for statements that cannot "reasonably [be] interpreted as stating actual facts" about an individual. [*Hustler Magazine v.*] *Falwell*, 485 U.S. [46] at 50, 108 S.Ct. [876] at 879 [99 L.Ed.2d 41 (1988)]. This provides assurance that *public debate* will not suffer for lack of "imaginative expression" or the "rhetorical hyperbole" *which has traditionally added much to the discourse of our Nation....*

The *New York Times—Butts—*and *Gertz* culpability requirements further ensure that debate *on public issues* remains "uninhibited, robust, and wide open." *New York Times*, 376 U.S. at 270, 84 S.Ct. at 720. Thus, where a statement of opinion *on a matter of public concern* reasonably implies false or defamatory facts *regarding public figures or officials*, those individuals must show that such statements were made with knowledge of their false implications or with reckless disregard of their truth. Similarly, where such a statement involves a private figure *on a matter of public concern*, a plaintiff must show that the false connotations were made with some level of fault as required by *Gertz....*

*Milkovich*, 110 S.Ct. at 2706–07 (footnotes omitted) (emphasis supplied). The emphasis in the above text, as well as a reading of the cases themselves, demonstrates that the existence of either a public plaintiff or a public issue was a significant, if not determinative, factor in each decision.[4] Ac-

**4.** Although the issue was not expressly addressed in *Milkovich* itself, it is apparent that the facts of that case, concerning the possibility of perjury in a state court proceeding relating to an issue affecting public schools, involve a matter of public concern.

cordingly, this case is not governed by the existing constitutional doctrine if it is a private plaintiff/private issue dispute. The validity of this position is even more apparent in light of the Supreme Court's own recognition, in *Hepps* and *Dun and Bradstreet,* that constitutional concerns are implicated only minimally in private plaintiff/private issue cases. Given the foregoing, the court holds that it must look to state law to determine whether an assertion of opinion is actionable in a private plaintiff/private issue dispute.[5]

In light of the court's holding, two issues must be decided in order to resolve Trump's motion. First, the court must determine whether this action does, in fact, present a private plaintiff/private issue dispute to which state law must apply. Second, if the court answers this first question affirmatively, the court must then determine whether Trump's statements are actionable under the applicable state standard.

■ The court has little difficulty determining that this action presents a private plaintiff/private issue dispute. With respect to the issue of the status of the plaintiff, Trump argues that Roffman is a "limited purpose public figure," as originally defined by the Supreme Court in *Gertz.* Under *Gertz,* a limited purpose public figure is an otherwise private individual who injects himself or herself into a public dispute, thereby attaining a position that is sufficiently "public" to justify the imposition of the actual malice requirement.[6]

Trump maintains that the likelihood of success of the Taj Mahal is a public issue, so that Roffman became a limited purpose public figure when he voluntarily offered his assessment of the casino's chances for success to the public.

Trump's argument ignores a significant aspect of the limited purpose public figure doctrine. *Gertz* and its progeny make clear that a limited purpose public figure is deemed public for only a limited range of issues. A "limited purpose" plaintiff is not deemed a public figure for purposes of defamation actions that are based on statements that do not relate to the public issue in which the plaintiff became involved. *See Gertz, supra; Marcone v. Penthouse International Magazine for Men,* 754 F.2d 1072 (3rd Cir.), *cert. denied,* 474 U.S. 864, 106 S.Ct. 182, 88 L.Ed.2d 151 (1985). If the case at hand does, in fact, involve a public issue, it is the future viability of the Taj Mahal. Trump's statements, however, all focus on Roffman's ability as an investment analyst and, more generally, his personal integrity. Roffman's individual competence and honesty do not give rise to the type of issues contemplated by *Gertz* as being sufficiently "public" to justify deeming Roffman a limited purpose public figure. While it may or may not be true that Roffman became embroiled in a public controversy by asserting his views on the future of the Taj Mahal, Trump's statements regarding Roffman are outside the scope of that controversy.[7]

---

5. The court has no occasion to decide whether the final result reached today would be any different under application of the principles stated in *Milkovich.* Indeed, the court does not reach the issue of whether there is, in fact, any difference between the state standard it applies today and the standards set forth in *Milkovich.* Additionally, the court does not make any comment on whether Trump's reading of the Milkovich standard (a statement must be objectively verifiable before it can be actionable) is accurate.

6. *Gertz* also recognizes that there are circumstances under which an individual can become a limited purpose public figure involuntarily, but those circumstances are not relevant to this action.

7. It could be argued that Roffman's act of offering a critique on the viability of the Taj Mahal (a purportedly public issue) made Roffman's ability to act as a critic a public issue, as well. Under this argument, Trump could claim that his statements, like Roffman's, relate to the possibility of success of the Taj Mahal. Specifically, Trump could assert that by discrediting Roffman he was actually attempting to demonstrate that the casino would, in fact, ultimately prove prosperous. This argument would fail, however, because the average person to whom Trump's statements were communicated would not make the connection between Trump's statements and the viability of the Taj Mahal. When read in context, Trump's assertions relate to Roffman's general ability to function as an analyst, and are not directly associated with the Taj Mahal. Any implication from the statements

■ Even if Roffman's statements could be said to be related to a public controversy, Roffman's participation in that controversy was of such insignificant proportion as to preclude the court from finding him to be a limited purpose public figure. In addition to the condition that the statements directed at an individual be related to the individual's involvement in a public issue, a finding of a limited purpose public figure also requires that the individual's involvement in the issue be substantial. As the Third Circuit stated in *Marcone, supra:*

> In general, to be a limited purpose public figure, the plaintiff must voluntarily *thrust himself into the vortex of the dispute.* From the voluntary act is derived the notion of assumption of the risk and the consequent fairness in labelling the person a public figure. In the typical limited purpose public figure case, the plaintiff actively participates in the public issue in a manner intended to obtain attention. For example, a meat producer that *aggressively* advertises its product in the media becomes a limited purpose public figure for comment on the quality of its product. *See Steaks Unlimited, Inc. v. Deaner,* 623 F.2d 264, 273–74 (3rd Cir.1980). Similarly, an agent who holds news conferences to attract media attention for himself and his client is a public figure in that context. *Woy v. Turner,* 573 F.Supp. 35 (N.D.Ga.1983).

*Marcone,* 754 F.2d at 1083 (emphasis supplied). Nothing in the record indicates that Roffman "aggressively" "thrust himself into the vortex" of a public dispute. Apparently, Roffman's only involvement in issues related to the success of the Taj Mahal are his brief comments published in the *Wall Street Journal.* This limited participation in the purported public issue does not rise to the level contemplated by *Gertz* or *Marcone. See also Bruno and Stillman Inc. v. Globe Newspaper Co.,* 633 F.2d 583 (1st Cir.1980) (a "fairly high" level of activity required in order to find a limited purpose public figure); *Fairley v. Peekskill Star Corporation,* 83 A.D.2d 294, 445 N.Y.S.2d 156 (1981) (plaintiff's participation in press interviews and small public speaking engagements not sufficient to justify finding of limited public figure, even when plaintiff played central role in dispute at issue). With respect to his involvement in the success or failure of the Taj Mahal, Roffman is best characterized as a mere passive commentator. Because Trump's statements do not relate to a public issue, and because, even if they did, Roffman was not significantly involved in the issue, Roffman must be considered a private plaintiff for purposes of this action.[8]

■ From the above analysis, it is apparent that this case, in addition to being a "private plaintiff" action, also involves issues of private concern. To reiterate, the statements that form the basis of Roffman's defamation action relate to Roffman's competence and integrity. Even if the question of the success or failure of the Taj presents a public issue, Trump's statements all concern private matters pertinent to Roffman himself that are of no concern to the general public. The court therefore determines that this action is a private plaintiff/private issue dispute, and, in accordance with the court's earlier determination, turns to the issue of whether Trump's statements are actionable under state law standards.

■ Pennsylvania courts, whose law controls this action, have adopted Section 566 of the Restatement (Second) of Torts. *Baker v. Lafayette College,* 516 Pa. 291, 532 A.2d 399 (1987); *Beckman v. Dunn,* 276 Pa.Super. 527, 419 A.2d 583 (1980); *Braig v. Field Communications,* 310 Pa. Super. 569, 456 A.2d 1366 (1983); *Veno v.*

---

that Trump intended to set forth his views on Roffman's ability to specifically predict the future of the Taj Mahal is attenuated, at best. *Cf. Smith v. A Pocono Country Place Property Owners,* 686 F.Supp. 1053, 1059 (M.D.Pa.1987) (defendants' criticism of plaintiff's background deemed issue of public concern when defendants "integrated" such comments with statements concerning a public controversy).

**8.** The court's determination that Roffman is a private plaintiff renders moot the "actual malice" issue addressed by the parties.

**419**

*Meredith,* 357 Pa.Super 85, 515 A.2d 571 (1986); *Dougherty v. Boyertown Times,* 377 Pa.Super. 462, 547 A.2d 778 (1988).[9] Section 566 states that "[a] defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion." Comment (c) to § 566 reads as follows:

A simple expression of opinion based on disclosed or assumed nondefamatory facts is not itself sufficient for an action of defamation, no matter how unjustified and unreasonable the opinion may be or how derogatory it is. But an expression of opinion that is not based on disclosed or assumed facts and therefore implies that there are undisclosed facts on which the opinion is based, is treated differently. The difference lies in the effect upon the recipient of the communication. In the first case, the communication itself indicates to him that there is no defamatory factual statement. In the second, it does not, and if the recipient draws the reasonable conclusion that the derogatory opinion expressed in the comment must have been based on undisclosed defamatory facts, the defendant is subject to liability.

Restatement (Second) of Torts, § 566, Comment (c).

When judged by this standard, it is evident that many of Trump's statements must be permitted to form the basis of a defamation action. Many of the assertions are statements of opinion indicating Trump's belief that Roffman was a poor investment analyst. A reasonable recipient of these communications would almost certainly infer that Trump based his assessment of Roffman's abilities on some undisclosed additional information; there can be little doubt that a person who hears someone criticizing another's job performance would presume that the person doling out the disparaging comments possessed knowledge of some facts on which to base the criticism. The court finds that some, if not all, of Trump's statements are either factual assertions or statements of opinion that imply allegations of undisclosed defamatory facts.[10] Accordingly, Roffman has alleged statements that are actionable under Pennsylvania law, and Trump's motion for summary judgment must be denied.[11]

CONCLUSION

Because Roffman is a private figure defamation plaintiff who is suing on statements related to issues of private concern, state law standards must apply to determine the actionability of the allegedly defamatory statements. At least some of Trump's statements are actionable under Pennsylvania law because they are either factual assertions or opinions that imply allegations of undisclosed defamatory

**9.** It is true that much of the commentary to § 566 sets forth conclusions that rest on the constitutional privilege position that was expressly rejected by *Milkovich.* The court might be persuaded to believe that this fact cuts against application of the Restatement standard to this case if the Pennsylvania courts adopted § 566 under the mistaken impression that *Gertz* constitutionally required them to create a means for separating privileged opinion from non-privileged fact. A reading of the Pennsylvania decisions applying the Restatement standard, however, reveals that the Pennsylvania courts were under no such impression. *Baker, Beckman, Veno* and *Dougherty* were decisions in which the courts applied § 566 without reference to *Gertz,* or indeed, to any constitutional principles whatsoever. Although the court in *Braig* did, in fact, cite to *Gertz* in its discussion of the non-actionability of opinions, it did not in any way indicate that it was interpreting *Gertz* to constitutionally require an opinion privilege.

Accordingly, it is apparent that the Pennsylvania courts did not rely on a constitutional misconception when they incorporated § 566 into Pennsylvania common law, so that § 566 must be given effect whenever Pennsylvania common law applies.

**10.** The factual assertions and implications must be deemed capable of defamatory meaning because they accuse Roffman of inability to adequately perform in his chosen profession. *See Thomas Merton Center v. Rockwell International,* 497 Pa. 460, 463, 442 A.2d 213, 216 (1981), *cert. denied,* 457 U.S. 1134, 102 S.Ct. 2961, 73 L.Ed.2d 1351 (1982).

**11.** The court does not hold that all of Trump's statements necessarily meet the standard addressed above. The court holds only that at least *some* of Trump's statements are sufficiently actionable so as to require the denial of defendant's motion for summary judgment.

facts. Accordingly, Trump's motion to dismiss Count I must be denied.